MICHAEL A. BUCCI II (MB7201)
78 Willow Avenue
Larchmont, NY 10538
(914) 400-4333
*Attorney for Plaintiff*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CORTNEY NATHANSON,

|  |  |
|---|---|
| Plaintiff, | **Civ. No.:  1:16-cv-04809** |
| -against- | **COMPLAINT** |
| JONES DAY, | **Jury Trial Demanded** |
| Defendant. | |

-------------------------------------------------------x

Plaintiff Cortney Nathanson, by and through her attorney, Michael A. Bucci II, Esq., alleges upon knowledge as to herself and her own acts, and otherwise upon information and belief, the following:

## NATURE OF ACTION

1.      Plaintiff brings this pregnancy, disability, gender, and age discrimination action against her former employer, Jones Day ("Jones Day" or the "Firm"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq*. ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C., as amended, §§ 621 *et seq.* ("ADEA"), and the New York City Administrative Code, as amended, § 8-107 et seq. ("NYCHRL").

2.      Plaintiff seeks compensatory and punitive damages, liquidated damages, emotional distress damages, attorneys' fees, and other appropriate relief under these Federal and local laws.

## THE PARTIES

3.      Plaintiff, Cortney Nathanson, is the former Business Development & Communications ("BD&C") Manager of Jones Day's office located in New York, NY ("NY Office").  She resides in New York, NY, is a female citizen of the United States, and was terminated by Jones Day on July 15, 2015 (effective as of August 1, 2015), four (4) months after her return from a maternity/disability leave relating to the birth of her first child.

4.      Jones Day is an international law firm with approximately 42 offices worldwide, including the NY Office, which is the largest of the firm's offices and currently located at 250 Vesey Street, New York, NY.

5.      Ms. Nathanson was an "employee" within the meaning of the above referenced statutes during her tenure with Jones Day.

6.      Jones Day is considered an "employer" for purposes of the above referenced statutes and employs more than 500 people.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343, and may assert supplemental jurisdiction over the state and city claims as authorized by 28 U.S.C. § 1367(a).

8.      Venue properly lies within this district pursuant to 28 U.S.C. § 1391 as Ms. Nathanson resides in this judicial district, the NY Office is located in this judicial district, and a substantial part of the acts alleged herein occurred in this judicial district.

9.      Ms. Nathanson timely filed a charge of discrimination against Jones Day with the Equal Employment Opportunity Commission ("EEOC") on or about October 1, 2015 and, after a failed mediation, received on April 12, 2016 a right-to-sue letter dated April 8, 2016.  Accordingly, she has

Nathanson Complaint

complied with all procedural requirements under Title VII and the ADEA.

10.      Ms. Nathanson has complied with all prerequisites to jurisdiction in this Court under the NYCHRL.

## **STATEMENT OF FACTS**

11.      Jones Day hired Ms. Nathanson in 2002 as the BD&C Manager of the NY Office, and she held that position until Jones Day terminated her some thirteen (13) years later.

12.      Ms. Nathanson was forty-four (44) years old when she was terminated.

13.      Ms. Nathanson had an accomplished career at Jones Day, and was well regarded by her colleagues and superiors.

14.      Ms. Nathanson was the only BD& C Manager resident in the NY Office during her thirteen (13) year tenure.

15.      While employed by Jones Day, Ms. Nathanson handled virtually every aspect of business development and marketing in the NY Office, including client proposals, events, client research and analysis, presentations, lawyer coaching, employee training, and public relations.

16.      Ms. Nathanson successfully managed national and international business development activities for Jones Day and, among other things, worked in Jones Day's Singapore Office in 2013 to help obtain a license to practice local law, and oversaw the opening of Jones Day's Boston Office ("Boston Office") in 2011.

17.      Ms. Nathanson served for more than a year as the first BD&C Manager of the Boston Office, commuting to Boston from NYC on a regular basis, while simultaneously remaining the BD&C Manager of the NY Office.

3

18.　　　　In or about April 2012, Jones Day hired Ms. Kathleen Reagan, then thirty-one (31) years old, to be the exclusive BD&C Manager of the Boston Office.

19.　　　　After Ms. Reagan was hired, Ms. Nathanson relinquished her dual role – for which she had been awarded a substantial bonus – and no longer regularly worked out of the Boston Office.　Nevertheless, Ms. Nathanson thereafter remained available to Ms. Reagan for advice and help as needed.

20.　　　　During her tenure at Jones Day, Ms. Nathanson rejected offers to work at other prominent firms, sometimes for substantially more money, because of her ever increasing responsibility at Jones Day, and because Jones Day indicated it intended to give her even more strategic roles within the firm.

21.　　　　In January 2014, Ms. Nathanson became pregnant with her first child, and by the summer of 2014 her pregnancy was obvious to everyone with whom she worked.

22.　　　　In August 2014, in anticipation of her impending maternity leave, Ms. Nathanson suggested to Ms. Cherie Olland, Global Director of Jones Day's BD&C department and based in its Cleveland Office ("Ms. Olland"), and to Ms. Barbara Nicoll, the NY Office Administrator ("Ms. Nicoll"), that Jones Day hire Mr. Christopher Frawley ("Mr. Frawley") on a temporary basis in the NY Office to cover for Ms. Nathanson and assume her duties during her leave.

23.　　　　Mr. Frawley had worked directly under Ms. Nathanson at Jones Day a few years earlier and Ms. Nathanson was confident he would be a good short-term solution.

24.　　　　Around this same time, Ms. Olland spoke with Ms. Nathanson about a possible BD&C Department restructuring that Ms. Olland had first mentioned in the Spring of 2014. Ms. Olland said nothing specific had been decided or was imminent, but that Ms. Nathanson

4

would continue to have a significant role with business development after any restructuring.

25.      In August 2014, Jones Day hired Mr. Frawley, who was thirty-nine (39) years old, as a temporary employee in the BD&C Department of the NY Office at an annualized salary of $100,000.

26.      Ms. Nathanson began her maternity leave on October 20, 2014 and was scheduled to return to Jones Day in January 2015.

27.      Prior to her scheduled return, Ms. Nathanson was diagnosed by her doctor with postpartum depression and required to take disability leave through March 4, 2015, after which she returned to Jones Day full-time.

28.      Ms. Nathanson had been on leave almost five (5) months by the time she returned to the firm in March 2015.

29.      Following Ms. Nathanson's return to Jones Day, Ms. Lisa Laukitis, the BD&C Partner for the NY Office ("Ms. Laukitis"), began to scrutinize Ms. Nathanson's work without explanation and to micro manage what previously had been Ms. Nathanson's routine responsibilities.

30.      Ms. Laukitis now questioned whether Ms. Nathanson was up to certain tasks, diminished Ms. Nathanson's responsibilities by diverting previously routine work away from her, and said that Jones Day partners did not think Ms. Nathanson was being properly responsive.

31.      Ms. Laukitis also misrepresented the urgency of certain projects, in order to dupe Ms. Nathanson and misdirect her focus.

32.      Although Ms. Nathanson intended to have a second child, she did not broadcast that

intention when she returned to work in March 2015.  At the same time, Ms. Nathanson did not

hide her intention to have more children when discussing family and personal matters with

Jones Day colleagues, including with Ms. Lautikis, Ms. Olland, Ms. Nicoll, and Ms. Jennifer

Musser, Senior Proposals Manager located in Jones Day's Chicago Office ("Ms. Musser").

33.        On April 1, 2015 Ms. Olland met with Ms. Nathanson in the NY Office for a general

status update.

34.        During this April 1 meeting, Ms. Olland briefly discussed an impending firm-wide

restructuring of the BD&C Department that would purportedly affect all Jones Day offices.

Ms. Olland said she was unsure when the restructuring would occur, but said once it was

officially announced Ms. Nathanson would be tasked to focus on high-level strategic business

development.

35.        Ms. Nathanson welcomed a more strategic role and tried to discuss it in more detail,

but Ms. Olland was circumspect and did not do so.  Instead, Ms. Olland proceeded to ask about

Mr. Frawley, and whether Ms. Nathanson thought Mr. Frawley would be suited for a firm-wide

Proposals Manager position to be resident in the NY Office.

36.        Ms. Nathanson inferred from Ms. Olland's questions that Mr. Frawley would be

working under Ms. Nathanson following the restructuring, so she asked Ms. Olland how the

Proposals Manager role would fit under the new structure, and how its responsibilities might

dovetail with the high-level strategic position she had just mentioned for Ms. Nathanson.

37.        Ms. Olland remained vague about the restructuring and ended the meeting without

answering Ms. Nathanson's questions.

38.        Promptly thereafter, Ms. Olland met with Mr. Frawley to discuss the "post-

6

restructuring" Proposals Manager position with him.

39.     About two (2) weeks later Jones Day changed Mr. Frawley's employment status from "temporary" to "permanent" and he was offered retroactive benefits.

40.     On June 25, 2015 Ms. Olland told Mr. Frawley he had been approved to become a BD&C Proposals Manager following the BD&C Department restructuring, though Ms. Olland did not tell him when the restructuring would take effect.

41.     On June 30, 2015 Ms. Nathanson received her annual review from Ms. Nicoll, Ms. Laukitis, and Ms. Olland (who participated by phone from Cleveland).

42.     This was the first time in her thirteen (13) years at Jones Day that Ms. Nathanson was reviewed by a "panel."

43.     During the review, Ms. Nathanson was informed that Jones Day had decided – based on "market research" – to cap her annual salary at its then current $280,000 level effective July 1, 2015.  Ms. Nathanson asked about the status of the restructuring but was not given any specific information.

44.     A few days after the review, Ms. Laukitis claimed an urgent need for an extensive mid-year BD&C budget analysis, which Ms. Nathanson proceeded to spend the next week preparing.

45.     On July 13, 2015, Ms. Laukitis scheduled a meeting with Ms. Nathanson for July 15, two (2) days later, to ostensibly discuss the status of Ms. Nathanson's budget analysis.

46.     When Ms. Nathanson arrived at the purported "budget" meeting on July 15, only Ms. Nicoll and Ms. Sarah McClure, Jones Day's HR Director and Counsel and based in its Washington, DC Office ("Ms. McClure"), were in attendance.

Nathanson Complaint

47.     Ms. Laukitis did not attend or otherwise participate in this July 15, 2015 meeting, and budgeting was not discussed.

48.     At the July 15, 2015 meeting Ms. Nathanson was summarily terminated, handed a separation and release agreement ("Release"), and directed to immediately clean out her desk and provide Mr. Frawley with a detailed explanation of each of her current projects.

49.     Ms. Nathanson was in a state of shock but complied with these directives and, with Human Resources personnel "standing guard," she explained her projects to Mr. Frawley, gathered together her personal possessions, and was then ignominiously escorted out of the office like a common thief.

50.     Ms. Nathanson refused to sign the Release that, among other things, offered her $49,377 in exchange for a release of all claims against Jones Day.

51.     A few hours after her termination, a July 15, 2015 memo from Jones Day partner Glen Nager ("Memo") was circulated to all firm lawyers/staff announcing the restructuring ("Restructuring").

52.     The Memo indicated that, in connection with the Restructuring, Mr. Frawley had a new permanent position as "Proposals Assistant."

53.     The Memo did not indicate who had been laid off in connection with the Restructuring,

54.     In the days and weeks following the Memo, Jones Day never circulated any other memo or written notice to its lawyers and staff explaining that Ms. Nathanson had been laid off in connection with the Restructuring.

55.     Many Jones Day lawyers and staff believed Ms. Nathanson had simply quit, others

8

believed she had been fired.

56.      Under the new BD&C Department structure, Mr. Frawley reports to two (2) Senior Proposals Managers, one of whom has a lower salary than Mr. Frawley.

57.      With Ms. Nathanson gone, as of July 15, 2015 Mr. Frawley assumed many of the duties and responsibilities previously handled by Ms. Nathanson and became the *defacto* BD&C Manager of the NY Office.

58.      Prior to the Restructuring, Jones Day promised to promote Mr. Frawley to Proposals Manager.

59.      Following the Restructuring, Jones Day told Mr. Frawley he would become a Proposals Manager as soon as "an HR issue" was resolved.

60.      Jones Day terminated five (5) employees in the BD&C Department in connection with the Restructuring, including Ms. Nathanson.

61.      Each of the five (5) terminated employees was female, and each was over forty (40) years old when terminated.

62.      In connection with the Restructuring, Jones Day decided to have one BD&C Manager cover aspects of both the NY Office and the Boston Office, and Jones Day chose Ms. Reagan over Ms. Nathanson for that role.

63.      As of July 15, 2015, Ms. Reagan was thirty-four (34) years old and Ms. Nathanson forty-four (44).

64.      As of July 15, 2015, Ms. Reagan was single, ten (10) years younger than Ms. Nathansan, less experienced, and had never had any business development responsibility for both the NY Office and Boston Offices.

65.     Approximately one (1) month after Ms. Nathanson's termination she miscarried a pregnancy.

66.     Following Ms. Nathanson's termination, Jones Day hired additional business development employees to perform work previously handled by Ms. Nathanson, including an "Events Coordinator" hired in November 2015 in the NY Office at an annual salary of $70,000.

67.     By the end of November 2015, no less than three (3) people were employed by Jones Day to perform the same work that Ms. Nathanson had herself performed prior to her termination, including Ms. Reagan, Mr. Frawley, and the Events Coordinator.

68.      Ms. Nathanson, who is the sole wage earner in her family and gave birth to her second child in the Spring of 2016, does not currently receive any earned income.

## FIRST CAUSE OF ACTION
### (Pregnancy and/or Disability Discrimination in Violation of Title VII)

69.     Ms. Nathanson repeats and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully stated herein.

70.     Jones Day discriminated against Ms. Nathanson on the basis of her pregnancy, childbirth, and/or related medical conditions in violation of Title VII by treating her differently from and less preferably than similarly situated employees who were not pregnant, intending to become pregnant, and/or disabled, and by terminating her employment because of her pregnancy, intention to become pregnant, and/or disability.

71.     As a result of Jones Day's discriminatory conduct, Ms. Nathanson has suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past

and future income, compensation, and benefits, for which she in entitled to an award of monetary damages and other relief.

72.      As a direct and proximate result of Jones Day's discriminatory conduct in violation of Title VII, Ms. Nathanson has suffered and continues to suffer mental anguish and emotional distress, including but not limited to, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

73.      Jones Day's discriminatory actions in violation of Title VII were intentional, deliberate, willful, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Ms. Nathanson's civil rights, for which she is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Gender Discrimination in Violation of Title VII)

74.      Ms. Nathanson repeats and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully stated herein.

75.      Jones Day discriminated against Ms. Nathanson in violation of Title VII by treating her differently from and less preferably than similarly situated male employees, and by terminating her employment because of her gender.

76.      As a result of Jones Day's discriminatory conduct, Ms. Nathanson has suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past and future income, compensation and benefits, for which she in entitled to an award of monetary damages and other relief.

11

77.     As a direct and proximate result of Jones Day's discriminatory conduct in violation of Title VII, Ms. Nathanson has suffered and continues to suffer mental anguish and emotional distress, including but not limited to, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

78.     Jones Day's discriminatory actions in violation of Title VII were intentional, deliberate, willful, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Ms. Nathanson's civil rights, for which she is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (Age Discrimination in Violation of the ADEA)

79.     Ms. Nathanson repeats and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully stated herein.

80.     Jones Day discriminated against Ms. Nathanson in violation of the ADEA by treating her differently than similarly situated employees who were less than forty (40) years old, and by terminating her employment because of her age.

81.     Jones Day discriminated against Ms. Nathanson in violation of Title VII by treating her differently from and less preferably than employees under the age of forty (40), and by terminating her employment because of her age.

82.     As a result of Jones Day's discriminatory conduct in violation of the ADEA, Ms. Nathanson has suffered and continues to suffer monetary and/or economic harm, including, but

Nathanson Complaint

not limited to, loss of past and future income, compensation and benefits, for which she in entitled to an award of monetary damages and other relief.

83.        Jones Day's discriminatory actions in violation of the ADEA were willful, and/or showed a reckless indifference as to whether its conduct violated the ADEA, for which Ms. Nathanson is entitled to an award of liquidated damages.

### FOURTH CAUSE OF ACTION
### (Gender, Pregnancy, Disability and/or Age Discrimination in Violation of NYCHRL)

84.        Ms. Nathanson repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

85.        The NYCHRL prohibits employment discrimination, adverse employment decision, and disparate treatment because of gender, pregnancy, disability and/or age.

86.        Jones Day's termination of Ms. Nathanson on the basis of her gender, pregnancy, disability and/or age constitutes unlawful discrimination in violation of the NYCHRL, and she is entitled to damages as a result.

87.        As a result of Jones Day's discriminatory conduct, Ms. Nathanson has suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past and future income, compensation, and benefits, for which she in entitled to an award of monetary damages and other relief.

88.        As a direct and proximate result of Jones Day's discriminatory conduct in violation of the NYCHRL, Ms. Nathanson has suffered and continues to suffer mental anguish and emotional distress, including but not limited to, embarrassment, stress and anxiety, loss of self-

Nathanson Complaint

esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

89.     Jones Day's discriminatory actions in violation of the NYCHRL were intentional, deliberate, willful, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Ms. Nathanson's rights thereunder, for which she is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff Cortney Nathanson demands that judgment be entered in her favor and that the Court order and award her the following relief against defendant:

A.     A declaratory judgment that the actions, conduct and practices of Jones Day complained of herein violate the laws of the United States and of The City of New York;

B.     An order directing Jones Day to place Ms. Nathanson in the position she would have occupied but for Jones Day's discrimination, as well as take such affirmative action, including reinstatement, as necessary to ensure that the effects of these unlawful employment practices are eliminated and do not affect Ms. Nathanson's employment;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate plaintiff for all non-monetary and compensatory harm, including, but not limited to, compensation for her humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering;

D.     An award of damages for any and all monetary and/or non-monetary losses suffered by plaintiff in an amount to be determined at trial, plus prejudgment interest;

E.     An award of punitive damages;

F.     An award of liquidated damages;

G.     Attorneys fees;

H.     Costs and disbursements; and

I.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury as to all issues in the above matter.


Dated: Larchmont, New York
       June 21, 2016

                                   Respectfully submitted,

                                   *Michael A. Bucci II*

                                   MICHAEL A. BUCCI II (MB7201)
                                   michaelbucci3@gmail.com
                                   Law Offices of Michael A. Bucci II
                                   78 Willow Avenue
                                   Larchmont, New York 10538
                                   (914) 400-4333
                                   *Attorney for Plaintiff*

Nathanson Complaint